# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re:

      LBI MEDIA, INC., *et al.*,

Debtors.[1]

---

ANKURA TRUST COMPANY, LLC, solely in its capacity as First Lien Collateral Trustee, and HPS INVESTMENT PARTNERS, LLC,

                      Plaintiffs,

      v.

CASPIAN SELECT CREDIT MASTER FUND, LTD., CASPIAN SOLITUDE MASTER FUND, L.P., SUPER CASPIAN CAYMAN FUND LIMITED, CASPIAN HLSC1, LLC, CASPIAN SC HOLDINGS, L.P., CASPIAN FOCUSED OPPORTUNITIES FUND, L.P., MARINER LDC, BLACKSTONE DIVERSIFIED MULTI STRATEGY FUND, BLACKSTONE ALTERNATIVE MULTI-STRATEGY SUB FUND I.V., L.L.C., LATIGO ULTRA MASTER FUND, LTD., CROWN MANAGED

Chapter 11

Case No. 18-12655 (CSS)

Jointly Administered

**Adversary No. _____**

**ADVERSARY COMPLAINT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: LBI Media, Inc. (8901); Liberman Broadcasting, Inc. (8078); LBI Media Holdings, Inc. (4918); LBI Media Intermediate Holdings, Inc. (9635); Empire Burbank Studios LLC (4443); Liberman Broadcasting of California LLC (1156); LBI Radio License LLC (8905); Liberman Broadcasting of Houston LLC (6005); Liberman Broadcasting of Houston License LLC (6277); Liberman Television of Houston LLC (2887); KZJL License LLC (2880); Liberman Television LLC (8919); KRCA Television LLC (4579); KRCA License LLC (8917); Liberman Television of Dallas LLC (6163); Liberman Television of Dallas License LLC (1566); Liberman Broadcasting of Dallas LLC (6468); and Liberman Broadcasting of Dallas License LLC (6537). The Debtors' mailing address is 1845 West Empire Avenue, Burbank, California 91504.

ACCOUNTS SPC ACTING FOR AND ON
BEHALF OF CROWN / LATIGO
SEGREGATED PORTFOLIO, ARCHVIEW
FUND, L.P., ARCHVIEW MASTER FUND,
LTD., ARCHVIEW ERISA MASTER FUND,
LTD., ARCHVIEW CREDIT OPPORTUNITIES
FUND I, L.P., YORK CREDIT
OPPORTUNITIES FUND, L.P., YORK
GLOBAL CREDIT MASTER INCOME
MASTER FUND, LTD., YORK CREDIT
OPPORTUNITIES INVESTMENTS MASTER
FUND, L.P., EXUMA CAPITAL, L.P., RIVA
RIDGE RECOVERY FUND LLC, KILDONIAN
CASTLE GLOBAL CREDIT OPPORTUNITY
MASTER FUND, LTD., and KILDONIAN
QUEBEC FUND, LTD.,

Defendants.

Ankura Trust Company, LLC ("the First Lien Collateral Trustee"), in its capacity as collateral trustee for holders of certain 10% Senior Secured Notes (the "First Lien Notes") issued by the Debtors, and at the direction of the holders of the First Lien Notes (the "First Lien Investors" or "First Lien Noteholders"), and HPS Investment Partners, LLC, in its capacity as investment advisor for certain HPS-managed investment funds and separately held accounts that hold the First Lien Notes ("HPS"), jointly file this Adversary Complaint against the above-captioned holders ("Defendants") of the 11½%/13½% PIK Toggle Second Priority Secured Subordinated Notes due 2020, Series II (the "Second Lien Notes") issued by LBI Media, Inc.  Plaintiffs respectfully allege as follows:

## **NATURE OF THE ACTION**

1.      The First Lien Collateral Trustee and HPS bring this action to obtain relief from Defendants' breaches of the Amended and Restated Intercreditor Agreement (the "Intercreditor," the "Agreement," or the "Intercreditor Agreement").

2.      The Intercreditor sets forth the relative rights, positions, and priorities of investors in certain secured debt issued by LBI – the First Lien Investors and investors in junior subordinated Second Lien Notes, including Defendants (the "Second Lien Investors"). A copy of the Intercreditor is attached as Exhibit A to this Complaint.

3.      The Agreement was negotiated in 2014 by Debtor LBI Media, Inc. and by Trustees representing the First and Second Lien Investors – all sophisticated parties with extensive experience negotiating and entering into debt-financing agreements, including intercreditor agreements.  Defendants knowingly agreed to be bound by the Intercreditor at the time they acquired their Second Lien Notes.

4.      Like all intercreditor agreements, the Intercreditor governing LBI's debt was designed to, among other things, streamline and expedite any potential restructuring.  To achieve that goal, the parties agreed to a number of terms that protect and clarify the parties' comparative rights and positions.

5.      Those provisions include, but are not limited to, provisions that prohibit Defendants from: (a) seeking relief from the automatic stay issued upon a Chapter 11 filing; (b) challenging any claim by the First Lien Investors for a post-petition "make-whole" payment; (c) challenging "the validity, perfection, priority, extent or enforceability" of the liens securing the First Lien Investors' claims; or (d) objecting to any use of cash collateral or debtor-in-possession financing ("DIP Financing") consented to by the First Lien Investors.

6.      Defendants have now violated the bargained-for and agreed-upon provisions of the Intercreditor in at least five ways.

7.      First, by seeking to lift the automatic stay to pursue claims that are property of the Debtors, Defendants breached Section 6.2 of the Intercreditor, which not only explicitly

prohibits Defendants from attempting to lift the automatic stay, but also prohibits Defendants from pursuing the relief that their claims would seek.

8.      Second, Defendants have breached Section 6.7 of the Intercreditor by challenging HPS's entitlement to a "make-whole" payment in their motion to lift the automatic stay, in their filed and proposed adversary proceedings, and in their objections to confirmation of the Modified Second Amended Joint Chapter 11 Plan of Reorganization of LBI Media, Inc. and Its Affiliated Debtors (D.I. 621 (the "Plan")).

9.      Third, by filing equitable-subordination claims against HPS and objecting to the Plan, Defendants violated Section 2.2 of the Intercreditor, which forbids contesting the validity, perfection, priority, extent, or enforceability of the lien securing HPS's First Lien Notes.

10.     Fourth, Defendants violated Section 6.1 of the Intercreditor by attempting to delay the Court's approval of the DIP Financing provided by HPS to the Debtors in this Chapter 11 case.

11.     Fifth, Defendants violated Section 3.2 of the Intercreditor by contesting the valuation proposed by the Debtors in connection with the Plan.

12.     Defendants' breaches of the Intercreditor come at the expense of the bargained-for rights of the First Lien Noteholders and the First Lien Collateral Trustee.  The breaches also threaten the orderly resolution of LBI's Chapter 11 proceeding.

13.     Plaintiffs thus request that the Court award Plaintiffs declaratory relief resolving their rights under the Intercreditor; an order of specific performance compelling Defendants to comply with that Agreement; attorney's fees and costs; and damages.

## **THE PARTIES**

14.     The First Lien Collateral Trustee is a limited liability company formed under

01:24291468.1

4

the laws of the State of New Hampshire with its principal place of business in Concord, New Hampshire.  It acts as First Lien Collateral Trustee for the First Lien Notes issued by the Debtors pursuant to the Indenture, dated March 18, 2011 (the "First Lien Indenture").[2]  In its capacity as First Lien Collateral Trustee, the First Lien Collateral Trustee is authorized and empowered, under the Intercreditor, to pursue the rights of the First Lien Investors, including HPS.  The First Lien Collateral Trustee has been directed to bring this suit by HPS.

15.     Plaintiff HPS is an investment adviser for certain HPS-managed investment funds and separately held accounts that hold the First Lien Notes issued by the Debtors under the First Lien Indenture.  HPS is an express third-party beneficiary of the Intercreditor.

16.     Defendants collectively describe themselves as an ad hoc group of holders of Second Lien Notes who, together, hold approximately 94 percent of the Second Lien Notes issued by the Debtors pursuant to a Series II Second Lien Notes Indenture, dated December 23, 2014 (the "Second Lien Indenture").[3]  The Intercreditor is binding upon Defendants pursuant to Section 8.16 of that Agreement.

17.     Defendant Archview Credit Opportunities Fund I L.P. is a Cayman Islands limited partnership with its principal place of business in Stamford, Connecticut.

18.     Defendant Archview ERISA Master Fund Ltd. is a Cayman Islands corporation with its principal place of business in Stamford, Connecticut.

---

[2]   The First Lien Indenture was supplemented by a supplemental indenture dated December 31, 2012, by a second supplemental indenture dated December 23, 2014, by a third supplemental indenture dated April 17, 2018, by a fourth supplemental indenture dated April 17, 2018, and by a fifth supplemental indenture dated October 25, 2018.

[3]   The Debtors issued Second Lien Notes pursuant to two indentures: the Series II Second Lien Notes Indenture, dated December 23, 2014, and the Second Priority Secured Subordinated Notes Indenture, dated December 31, 2012.  The Ad Hoc Group has identified its members as investors under the Second Lien Indenture.

19.     Defendant Archview Fund LP is a Delaware limited partnership with its principal place of business in Stamford, Connecticut.

20.     Defendant Blackstone Alternative Multi-Strategy Sub Fund IV, LLC, a wholly owned subsidiary of Blackstone Alternative Multi-Strategy Fund, a series of Blackstone Alternative Investment Funds, is a Delaware limited liability company with its principal place of business at c/o Caspian Capital LP in New York, New York.  Blackstone Alternative Multi Strategy Sub Fund IV, LLC is a fund managed by Caspian Capital LP.

21.     Defendant Blackstone Diversified Multi Strategy Fund, a sub-fund of Blackstone Alternative Investment Funds Plc, is an Irish investment company incorporated with limited liability, with its principal place of business at c/o Caspian Capital LP in New York, New York.   Blackstone Diversified Multi Strategy Fund is a fund managed by Caspian Capital LP.

22.     Defendant Caspian Focused Opportunities Fund, L.P. is a Delaware limited partnership with its principal place of business at c/o Caspian Capital LP in New York, New York.  Caspian Focused Opportunities Fund, L.P. is a fund managed by Caspian Capital LP.

23.     Defendant Caspian HLSC1, LLC is a Delaware limited liability company with its principal place of business at c/o Caspian Capital LP in New York, New York.  Caspian HLSC1, LLC is a fund managed by Caspian Capital LP.

24.     Defendant Caspian SC Holdings, L.P. is a Delaware limited partnership with its principal place of business at c/o Caspian Capital LP in New York, New York.  Caspian SC Holdings, L.P. is a fund managed by Caspian Capital LP.

25.     Defendant Caspian Select Master Credit Fund, Ltd. is a Cayman Islands exempted limited company with its principal place of business at c/o Caspian Capital LP in

New York, New York.   Caspian Select Master Credit Fund, Ltd. is a fund managed by Caspian Capital LP.

26.     Defendant Caspian Solitude Master Fund, L.P. is a Delaware limited partnership with its principal place of business at c/o Caspian Capital LP in New York, New York.  Caspian Solitude Master Fund, L.P. is a fund managed by Caspian Capital LP.

27.     Defendant Crown Managed Accounts SPC acting for and on behalf of Crown / Latigo Segregated Portfolio is an exempted company incorporated in the Cayman Islands with its principal place of business in New York, New York.

28.     Defendant Exuma Capital, L.P. is a Cayman Islands limited partnership with its principal place of business in New York, New York.  Exuma Capital, L.P. is a fund managed by York Capital Management Global Advisors, LLC and its affiliates.

29.     Defendant Kildonian Castle Global Credit Opportunity Master Fund, Ltd. is a Cayman Islands corporation with its principal place of business in the Cayman Islands.

30.     Defendant Kildonian Quebec Fund Ltd. is a Cayman Islands corporation with its principal place of business in the Cayman Islands.

31.     Defendant Latigo Ultra Master Fund, Ltd. is an exempted company incorporated in the Cayman Islands with its principal place of business in New York, New York.

32.     Defendant Mariner LDC is a Cayman Islands limited company with its principal place of business at c/o Caspian Capital LP in New York, New York.  Mariner LDC is a fund managed by Caspian Capital LP.

33.     Defendant Riva Ridge Recovery Fund LLC is a Delaware limited liability company with its principal place of business in New York, New York.

34.     Defendant Super Caspian Cayman Fund Limited is a Cayman Islands limited company with its principal place of business at c/o Caspian Capital LP in New York, New York.  Super Caspian Cayman Fund Limited is a fund managed by Caspian Capital LP.

35.     Defendant York Credit Opportunities Fund, L.P. is a Delaware limited partnership with its principal place of business in New York, New York.  York Credit Opportunities Fund, L.P. is a fund managed by York Capital Management Global Advisors, LLC and its affiliates.

36.     Defendant York Credit Opportunities Investment Master Fund, L.P. is a Cayman Islands limited partnership with its principal place of business in New York, New York.  York Credit Opportunities Investment Master Fund, L.P. is a fund managed by York Capital Management Global Advisors, LLC and its affiliates.

37.     Defendant York Global Credit Income Master Fund, L.P. is a Cayman Islands limited partnership with its principal place of business in New York, New York.  York Global Credit Income Master Fund, L.P. is a fund managed by York Capital Management Global Advisors, LLC and its affiliates.

## OTHER RELEVANT ENTITIES

38.     LBI Media, Inc., and affiliated entities ("LBI") are the Debtors in these Chapter 11 cases.  LBI Media, Inc., the Debtors' principal operating entity, is a corporation organized under the laws of California with its principal place of business in Burbank, California.  LBI is a party to the Intercreditor.

39.     U.S. Bank National Association ("U.S. Bank") is a national banking association organized under the laws of the United States.  The principal office of U.S. Bank is registered with the Office of the Comptroller of the Currency as Columbus, Ohio.  U.S. Bank acts as the "Series II Second Priority Secured Subordinated Notes Trustee" (the "Second

Lien Trustee") under the Second Lien Indenture and the "Second Priority Secured Subordinated Notes Trustee" under the Second Priority Secured Subordinated Notes Indenture.  In its capacity as Second Lien Trustee, U.S. Bank is a party to the Intercreditor.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction over this adversary proceeding, which arises in and relates to the Debtors' cases pending before this Court under Chapter 11 of the Bankruptcy Code, under Sections 157, 1334, and 2201(a) of title 28, United States Code and the *Amended Standing Order of Reference*, dated February 29, 2012, of the United States District Court for the District of Delaware.

41.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (G) because it concerns the administration of LBI's estate, Plaintiffs' and Defendants' claims against the estate, and Defendants' attempt to lift the automatic stay. Accordingly, the Court may enter a final judgment consistent with Article III of the United States Constitution.  Plaintiffs consent to the entry of final orders or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

42.     Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409 because LBI's Chapter 11 proceeding is pending in this Court.

## FACTUAL BACKGROUND

### I.      LBI'S SECURED FINANCING

43.     LBI is the largest privately-held, minority-owned Spanish-language broadcaster in the United States.  Originally a family-owned and -operated business, today LBI is a national media company that owns or licenses twenty-seven Spanish-language television stations and radio stations in the largest markets in the United States.

01:24291468.1

44.    As LBI has grown over time, it has financed its operations in part through issuing secured debt.

45.    LBI had $233 million in First Lien Notes outstanding, as of November 21, 2018 (the "Petition Date").  The First Lien Notes, which were issued pursuant to the First Lien Indenture, are today held solely by HPS.

46.    As of the Petition Date, LBI had $259 million in 11½%/13½% PIK Toggle Second Priority Secured Subordinated Notes outstanding, which were issued under the Second Lien Indenture, dated December 23, 2014.

## II.    THE INTERCREDITOR AGREEMENT

### A.    Negotiation of the Intercreditor Agreement

47.    In 2014, LBI, along with the First Lien Collateral Trustee and the Second Lien Trustee, bargained for and entered into the Intercreditor.  All parties to the Intercreditor had the help of sophisticated advisors.

48.    Intercreditor agreements set out the relative rights, positions, and priorities of different creditors – here, investors in the First and Second Lien Notes (including Defendants and HPS).  Such agreements are standard when creditors have competing interests in shared collateral.

49.    Entering into the Intercreditor benefitted both the First and Second Lien Investors by allowing them to stipulate in advance how to resolve their competing interests and how they would work together with their issuer, LBI.

50.    Resolving such issues in advance is crucial for creditors like the First and Second Lien Investors, particularly if (as happened here) an issuer's financial capabilities erode and the issuer defaults.  Indeed, an intercreditor agreement is intended, at least in part, to ensure that the creditors' relative rights and obligations are enforced in the event of

bankruptcy.  Without an intercreditor agreement, each creditor might exercise its competing rights, creating costly legal disputes and hampering the efficient resolution of the debtor's estate.  The Intercreditor seeks to avoid precisely those problems by clarifying the investors' respective rights.

51.    The Intercreditor also was intended to benefit LBI.  By setting forth the respective rights of its creditors, LBI would be able to obtain necessary capital as well as expedite and streamline any reorganization process with respect to certain matters related to the shared collateral.

52.    The Intercreditor was negotiated by LBI; Credit Suisse, then the Collateral Trustee for the First Lien Notes; and U.S. Bank, acting as Trustee for the Second Lien Notes. Each of these parties is a sophisticated entity with experience negotiating and entering into debt-financing agreements, including intercreditor agreements.

53.    Each of the parties entered into the Intercreditor for good and valuable consideration.  It is a valid and enforceable contract.

54.    By its terms, the Intercreditor is enforceable in Chapter 11 proceedings.  (*See* Ex. A, Intercreditor Agreement §§ 6.10, 8.2; *see also* 11 U.S.C. § 510(a).)

**B.    The Intercreditor Applies to the First and Second Lien Investors**

55.    Although the Intercreditor was negotiated between LBI and the trustees for the First and Second Lien Notes, the Agreement makes clear that it applies to and binds the First and Second Lien Investors themselves.

56.    The plain language of the Agreement defines the First and Second Lien

Investors as third-party beneficiaries of the Agreement:[4]

> This Agreement and the rights and benefits hereof shall inure to the benefit of, and be binding upon, each of the parties hereto and their respective successors and assigns and shall inure to the benefit of each of, and be binding upon, the holders of First Priority Claims and Subordinated Lien Claims.[5] No other Person shall have or be entitled to assert rights or benefits hereunder.

(Ex. A, Intercreditor Agreement § 8.16.)

57.     In addition to receiving the benefits of the Intercreditor, the First and Second Lien Investors are also bound by its terms.   Under Section 8.11 of the Intercreditor, the Agreement is "binding upon the First Priority Lien Collateral Trustee, the First Priority Lien Holders, the Subordinated Lien Secured Parties, the Company, the Company's Subsidiaries party hereto and their respective permitted successors, transferees and assigns."  (*See* Ex. A, Intercreditor Agreement § 8.11).

58.     Moreover, by accepting their Second Lien Notes, Defendants agreed, pursuant to Section 1.04 of the Second Lien Indenture, to be bound by and to comply with the Intercreditor.  As Section 1.04(a) of the Second Lien Indenture states:

> Each Holder, by accepting a [Second Lien] Note, agrees, and the [Second Lien] Trustee agrees, that this Indenture is subject to the terms of the Priority Lien Intercreditor Agreement, that such Holder's and the Trustee's rights and benefits hereunder are

---

[4]     Although Section 8.16 makes the First and Second Lien Investors third-party beneficiaries to the Agreement, it is titled "No Third Party Beneficiaries; Successors and Assigns." However, Section 8.13 of the Agreement states that "[t]he section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of th[e] Agreement."

[5]     The Subordinated Lien Claims are defined in the Intercreditor Agreement as including "Subordinated Lien Obligations," which are defined as "Subordinated Lien Debt." "Subordinated Lien Debt" is defined as "Parity Lien Debt," which is defined as including "the Second Priority Secured Subordinated Notes" – i.e., the Second Lien Notes. (*See* Ex. A, Intercreditor Agreement at pp. 7-10.)    Therefore, Defendants are "holders of . . . Subordinated Lien Claims" under Section 8.16.

> limited accordingly, that such Holder's and the Trustee's rights and benefits are subject to all relevant provisions of the Priority Lien Intercreditor Agreement, and that such Holder shall comply with the provisions of the Priority Lien Intercreditor Agreement applicable to such Holder in its capacity as such as if such Holder was a party thereto. In the event of any conflict between the terms of this Indenture and those of the Priority Lien Intercreditor Agreement with respect to the rights, privileges, protections, indemnities and exemptions of the Trustee (in any of its capacities hereunder), the terms of this Indenture shall control.

(Ex. B, Second Lien Indenture § 1.04(a)).

59.    Defendants here are all Second Lien Investors.  Indeed, Defendants themselves were either already Investors when the Intercreditor was negotiated, or, like HPS, became Investors after the Intercreditor was already in place.  Defendants are thus bound to comply with the Intercreditor Agreement not only by that agreement's own terms, but by the terms of the Second Lien Indenture.

60.    Representatives of Caspian Capital LP and York Capital Management, investment advisors for certain Defendants, have acknowledged that they agreed to be bound by the Intercreditor at the time they caused those Defendants to purchase Second Lien Notes. Upon information and belief, all other Defendants knowingly agreed to be bound by the Intercreditor at the time they acquired their Second Lien Notes.

61.    Therefore, Defendants in this action, as well as HPS, the sole First Lien Noteholder, are express third-party beneficiaries of, and are bound by the terms of, the Intercreditor Agreement.

## III.    LBI'S BANKRUPTCY, THE AUTOMATIC STAY, AND DEFENDANTS' ADVERSARY PROCEEDING

### A.    LBI's Chapter 11 Filing

62.    On November 21, 2018, LBI commenced this Chapter 11 proceeding.

63.    When LBI filed its Chapter 11 petition, it simultaneously moved for authorization to obtain $38 million of debtor-in-possession financing by way of a superpriority senior secured multi-draw term loan credit facility (the "DIP Facility").  In accordance with the Intercreditor, the DIP Facility is provided by, and fully funded by, HPS.

64.    As the Debtors described in the disclosure statement filed in support of the Plan, the DIP Financing "is critical to ensure that the Debtors have sufficient liquidity to operate their business and administer their estates during these chapter 11 cases."[6]

### B.    Automatic Stay of Claims

65.    Upon LBI's Chapter 11 filing, an automatic stay issued under 11 U.S.C. § 362.

66.    The operation of Section 362 stayed claims related to the Debtors' estate, including certain claims filed by Defendants in an action in New York State Supreme Court against LBI, HPS, and LBI's co-founder and Chief Executive Officer, Lenard Liberman.  (Ex. C, Complaint, *Caspian Select Credit Master Fund, Ltd.* v. *HPS Inv. Partners, LLC*, No. 653685/2018, Dkt. 1 (N.Y. Sup. Ct. July 24, 2018) ("*Caspian II*").)

67.    In *Caspian II*, the plaintiffs (Defendants in this action) alleged claims for fraudulent conveyance (against HPS, LBI, and Liberman); aiding and abetting breach of fiduciary duty (against HPS); common-law fraud (against LBI and Liberman); aiding and abetting fraud (against HPS); tortious interference (against HPS); civil conspiracy (against HPS, LBI, and Liberman); and "deepening insolvency" (against HPS, LBI, and Liberman). (*See id.*)

---

[6]    D.I. 44 ("Disclosure Statement") at 20; *see also* D.I. 12-3 ("Bojmel Decl.") ¶9 ("[T]he Debtors believe that the DIP Facility will allow the Debtors to pursue confirmation of their proposed chapter 11 plan and that, absent the ability to access the DIP Facility, even for a limited period of time, there is a substantial risk LBI will be unable to continue operating its businesses, resulting in a deterioration of value to the Debtors' estates.").

68.      The *Caspian II* claims all arose from Defendants' general allegation that the May 2018 financing agreement (the "Financing") between LBI and HPS was a fraudulent conveyance, or was otherwise tortious.  Those claims are based primarily on a specific provision in the financing agreement under which LBI agreed to provide a make-whole payment[7] to HPS if either (i) the debt under the First Lien Notes was accelerated or (ii) LBI filed for bankruptcy within four years of the Financing.  In essence, the *Caspian II* suit was a challenge to that make-whole payment.

69.      The automatic stay applied to all the claims raised in *Caspian II*, including those asserted against HPS:  the claims against HPS are derivative, and derivative claims are assets of the Company and thus subject to the automatic stay.  (*See* D.I. 414, at 2-4; D.I. 519, at 15-18).

70.      LBI put Defendants on notice that the automatic stay applies to all of the claims asserted in *Caspian II* – first in a notice filed by LBI with the New York state court on November 21, 2018, again in a telephonic conference held by the New York state court on November 26, 2018, and yet again by email on November 28, 2018.

71.      On December 10, 2018, Defendants moved for relief from the automatic stay for their *Caspian II* claims against HPS and Lenard Liberman.  (D.I. 141.)

72.      On December 28, 2018, both LBI and the Unsecured Creditors Committee filed objections to Defendants' motion (D.I. 253 and 255, respectively).  Both HPS and Liberman filed joinders on the same day (D.I.  254 and 256, respectively).

---

[7]      Make-whole provisions are common yield-protection terms in financing agreements.  The "make-whole" "permit[s] [a] lender, in the event of prepayment" or default, "to receive its bargained for yield."  *In re Sch. Specialty, Inc.*, No. 13-10125, 2013 WL 1838513, at *4 n.8 (Bankr. D. Del. Apr. 22, 2013) (quotation omitted).

73.    The parties resolved the motion through a stipulation filed on December 30, 2018, in which all parties consented to this Court's jurisdiction over the claims asserted in New York state court, and Defendants (plaintiffs in the *Caspian II* action) agreed to "promptly dismiss" the New York state actions.  This Court so-ordered that stipulation on January 2, 2019.  (D.I. 270.)

### C.    Defendants' Adversary Proceeding

74.    On January 15, 2019, Defendants filed an adversary complaint against LBI, Liberman, LBI's other directors, and HPS (the "Adversary Complaint" (D.I. 323)).  In the Adversary Complaint, Defendants asserted purportedly "direct" claims, including:  breach of contract of the Second Lien Indenture (against LBI); breach of contract regarding a forbearance agreement (the "Forbearance Agreement") between certain Second Lien Investors and LBI (against LBI); equitable subordination (against HPS); breach of fiduciary duty (against LBI, Liberman, and LBI's other directors); aiding and abetting breach of fiduciary duty (against HPS); tortious interference with contract regarding the Second Lien Indenture (against Liberman and LBI's other directors); and tortious interference with contract regarding the Forbearance Agreement (against HPS, Liberman, and LBI's other directors).  As with the *Caspian II* complaint, all of the Adversary Complaint's claims assert, in essence, that the Financing, including HPS's acquisition of First Lien Notes and the associated make-whole obligation, was fraudulent or otherwise tortious.

75.    The same day as they filed the Adversary Complaint, Defendants also filed a motion seeking leave to file additional, admittedly derivative, claims against LBI, LBI's directors, and HPS (the "Standing Motion" (D.I. 334)).  In the Standing Motion, and in the proposed adversary complaint attached to that motion (the "Proposed Adversary Complaint" (D.I. 334-2)), Defendants sought to add the following claims in addition to the purportedly

direct claims alleged in the Adversary Complaint:  actual fraudulent transfer under New York

Debtor & Creditor Law § 276 and 11 U.S.C. § 548(a)(1)(A) (against LBI, Liberman, LBI's

other directors, and HPS); constructive fraudulent transfer under New York Debtor &

Creditor Law § 274 and 11 U.S.C. § 548(a)(1)(B) (against LBI, Liberman, LBI's other

directors, and HPS); breach of fiduciary duty (against Liberman and LBI's other directors);

and aiding and abetting breach of fiduciary duty (against HPS).  All of these additional claims

also challenge the Financing, the make-whole associated with the Financing, and the validity,

perfection, and priority of HPS's First Lien Notes.

## IV.    DEFENDANTS HAVE VIOLATED THE INTERCREDITOR

76.    By filing their motion to lift the stay, the Adversary Complaint, the Standing

Motion, and the Proposed Adversary Complaint, objecting to the Plan, objecting to LBI's DIP

Financing, and contesting LBI's proposed valuation in connection with the confirmation of

the Plan, Defendants have violated the plain terms of at least five of their obligations in the

Intercreditor Agreement.

### A.    Defendants Breached Section 6.2 of the Intercreditor by Moving to Lift the Stay and Bringing the Adversary Proceeding

77.    The Intercreditor prohibits Defendants from seeking relief from the automatic

stay imposed upon the Debtors' filing of these Chapter 11 cases.

78.    Section 6.2 of the Agreement requires that

> [u]ntil the Discharge of First Priority Claims[8] has occurred, each
> Subordinated Lien Debt Representative, on behalf of itself and

---

[8]    Under the Agreement, "First Priority Claims" are "(a) all First Priority Lien Obligations" – defined as "the First Priority Lien Debt and all other Obligations in respect thereof, including Obligations owed to the collateral trustee under the First Priority Lien Debt Documents," (Ex. A, Intercreditor Agreement at 6); "(b) any claims for attorneys' fees, costs or expenses arising under Section 8.21 of this Agreement; and (c) all other Obligations (not constituting Indebtedness) with respect to First Priority Lien Debt," (*id.*

each applicable Subordinated Lien Secured Party,[9] ***agrees not to seek relief from the automatic stay*** or any other stay in any Insolvency or Liquidation Proceeding in respect of any assets of any Grantor that constitute First Priority Lien Collateral[10] ***without the prior written consent of the First Priority Lien Collateral Trustee and the holders of the majority of the First Priority Claims***. (Ex. A, Intercreditor Agreement § 6.2 (emphasis added)).

79.    Defendants here are Subordinated Lien Secured Parties.  (*See supra* n.9.)

80.    As the only First Lien Noteholder, HPS is the holder of the "majority of the First Priority Claims" against the "First Priority Lien Collateral."  (*See supra* n.8, n.10.)

81.    Defendants' motion to lift the automatic stay and the Adversary Proceeding (including the motion for derivative standing to pursue other claims) are "in respect of" the

---

at 4).  Moreover, under the Agreement, "First Priority Lien Debt" is "(1) "the First Priority Senior Secured Notes and the related subsidiary guarantees issued under the First Priority Senior Secured Notes Indenture; (2) the First Priority Bank Debt; and (3) Indebtedness under existing hedging agreements and any guarantees thereof that, in each case, was permitted to be incurred and so secured under each applicable First Priority Lien Debt Document."  (*Id.* at 5.)

[9]    Under the Agreement, "Subordinated Lien Secured Parties" include the "Series II Second Priority Secured Subordinated Notes Secured Parties." (Ex. A, Intercreditor Agreement at 10)  The "Series II Second Priority Secured Subordinated Notes Secured Parties" are defined as "holders of the Series II Second Priority Secured Subordinated Notes, the Series II Second Priority Secured Subordinated Notes Trustee and the Second Priority Collateral Agent."  (*Id.* at 9.)  The Series II Second Priority Secured Subordinated Notes are defined as the 11½%/13½% PIK Toggle Second Priority Secured Subordinated Notes issued under the Series II Second Priority Secured Subordinated Notes Indenture.  (*Id.*)  As investors in those Notes, Defendants are therefore "Subordinated Lien Secured Parties" under the Intercreditor.

[10]   Under the Agreement, "First Priority Lien Collateral" includes "the assets of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted, purported to be granted, or deemed under Section 2.3 of this Agreement to be granted as security for the First Priority Lien Obligations or other First Priority Claims."  (Ex. A, Intercreditor Agreement at 4-5).  Moreover, under the Amended and Restated Security Agreement, dated March 18, 2011, LBI granted to the Collateral Trustee, for itself and for the benefit of the other "Secured Parties" (including HPS, as a First Lien Investor), a security interest in LBI's property, including "contract rights . . . and all debts, obligations and liabilities in whatever form owing to such Debtor from any person, firm or corporation, or any other legal entity[.]"  *See* Ex. D, Amended and Restated Security Agreement at § 2(i).

First Priority Lien Collateral.  The tort claims that Defendants seek to pursue are First Priority

Lien Collateral because the First Lien Noteholders have a lien on all commercial tort claims

of LBI.  (*See* D.I. 519, at 4-5).  Furthermore, because the First Priority Lien Collateral

includes nearly all of the property in LBI's estate, any indemnification that LBI's bankruptcy

estate must pay HPS in connection with Defendants' claims will necessarily diminish the First

Priority Lien Collateral that secures HPS's First Lien Notes.

83.    Moreover, because all of Defendants' claims are derivative – and thus property

of LBI – those claims, as well, are "in respect of" First Priority Lien Collateral securing the

First Lien Notes.  Defendants' attempts to repackage those derivative claims as purportedly

"direct" are unpersuasive and contrary to settled law.  (*See* D.I. 519, at 15-18).

83.    Because the First Priority Claims have not yet been discharged – and because

Defendants have not sought, and the First Lien Collateral Trustee and HPS have not given,

written consent to seek relief from the automatic stay – Defendants' motion to lift the

automatic stay and adversary proceeding are "in respect of" the First Priority Lien Collateral

and thus violate Section 6.2 of the Intercreditor.

**B.    Defendants Breached Section 6.7 of the Intercreditor by Moving to Lift the Stay, Bringing the Adversary Proceeding, and Objecting to the Plan**

84.    Defendants' stay relief motion, the Adversary Complaint, the Standing Motion,

and objections to the Plan violate the Intercreditor Agreement by challenging HPS's claim for

a post-petition make-whole amount.  Section 6.7 of the Agreement provides that

> None of the Subordinated Lien Debt Representatives or any other
> Subordinated Lien Secured Party shall oppose or seek to challenge
> any claim by the First Priority Lien Collateral Trustee or any other
> First Priority Lien Secured Party for allowance in any Insolvency
> or Liquidation Proceeding of First Priority Lien Obligations
> consisting of post-petition interest, fees or expenses, ***including,
> without limitation, any prepayment premium or penalty or make-
> whole amount.***

(Ex. A, Intercreditor Agreement § 6.7(a) (emphasis added)).

85.     Defendants have opposed and attacked the make-whole amount involved in the May 2018 Financing as "fraudulent" and tortious in their Adversary Complaint, (*see, e.g.*, D.I. 323 ¶ 224 and p. 57), and by requesting leave in the Standing Motion to pursue additional claims to unwind the Financing in the Proposed Adversary Complaint, (*see* D.I. 334 & 334-2).  Those claims are a renewal of the claims challenging the make-whole that Defendants raised in the *Caspian II* litigation.

86.     Defendants repeated their attacks on the make-whole amount in their objections to the Plan.  (*See* D.I. 661).  Indeed, the key premise of Defendants' objections – which largely rehash the allegations in the *Caspian II* litigation – is that the make-whole "should be disallowed" and that the make-whole is part of a "fraudulent conveyance [which] cannot be confirmed."  *See id.* at 1.  Defendants also argue in their objections that the make-whole violates the absolute priority rule, *see id.* at 57-58, and was tortious in violation of New York law, *id.* at 75.

87.     Moreover, Section 6.4 of the Intercreditor contains turnover provisions that require a holder of Second Lien Notes to turn over any amounts it recovers in respect of any payments to the First Lien Noteholders otherwise being found to be "fraudulent" or "preferential."  The express language of Section 6.7, coupled with the turnover provisions of Section 6.4, make clear that the parties intended to prevent parties such as Defendants from challenging make-whole claims of the First Lien Noteholders on the basis of pre-petition conduct or otherwise.

C.     **Defendants Breached Section 2.2 of the Intercreditor Agreement**

88.     Defendants further violated the Intercreditor by challenging the validity,

perfection, priority, extent, or enforceability of the First Lien Noteholders' first-priority lien.

Under Section 2.2 of the Agreement:

> Each Subordinated Lien Debt Representative, for itself and on behalf of each applicable Subordinated Lien Secured Party, . . . agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, perfection, priority, extent or enforceability of (a) a Lien securing any First Priority Claims held (or purported to be held) by or on behalf of the First Priority Lien Collateral Trustee or any of the First Priority Lien Holders or any agent or trustee therefor in any First Priority Lien Collateral . . . .

(Ex. A, Intercreditor Agreement § 2.2).

89.     Defendants are Subordinated Lien Secured Parties under the Intercreditor (*id.* at 10). As a holder of First Priority Lien Obligations (Ex. A, Intercreditor Agreement at pp. 5-6), HPS is a First Priority Lien Secured Party (*id.* at 6), and thus is a First Priority Lien Holder under the Intercreditor (*id.* at 5). As a result, Section 2.2 of the Intercreditor prohibits Defendants from contesting any lien securing First Priority Claims held by HPS.

90.     Defendants inarguably contested HPS's First Priority Claims by seeking equitable subordination of HPS's First Lien Notes in the Adversary Complaint and Proposed Adversary Complaint. (D.I. 323; D.I. 334-2).

91.     Defendants also breached Section 2.2 by contesting and objecting to the Plan.

**D.     Defendants Breached Section 6.1 of the Intercreditor Agreement by Urging the Court to Delay Approval of the DIP Financing**

92.     Section 6.1 of the Intercreditor requires Defendants to "not object to and [ ] not otherwise contest [the] use of cash collateral or DIP Financing." (Ex. A, Intercreditor Agreement § 6.1(a)).

93.     At the November 27, 2018 first-day hearing, Defendants urged the Court to delay final approval of certain fees and expenses related to the DIP Financing (which were

part of an integrated package of post-petition financing terms) until the second-day hearing, contrary to the Debtors' request to approve such fees and expenses immediately upon entry of the interim DIP order.  (11/27/2018 Hr'g Tr. at 47-48).

94.    Defendants' objection to the Debtors' proposed terms for the DIP Financing violated Section 6.1's prohibition against objecting to or contesting the DIP Financing.

**E.    Defendants Breached Section 3.2 of the Intercreditor Agreement by Disputing the Debtors' Proposed Valuation**

95.    Defendants further violated the Intercreditor by contesting the valuation proposed by the Debtors in connection with the proposed Plan.  Section 3.2 of the Agreement provides that

> So long as the Discharge of First Priority Claims has not occurred, each Subordinated Lien Debt Representative, on behalf of itself and each applicable Subordinated Lien Secured Party, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right of a junior secured creditor (but not an unsecured creditor) to demand, request, plead, or otherwise assert, or claim the benefit of, any marshaling, appraisal, ***valuation***, or other similar right that may otherwise be available under applicable law with respect to the Common Collateral or any other similar rights a junior secured creditor may have under applicable law.

(Ex. A, Intercreditor Agreement § 3.2 (emphasis added)).

96.    Defendants are Subordinated Lien Secured Parties under the Intercreditor (*Id.* at 10).  The discharge of First Priority Claims has not yet occurred.  As a result, Section 3.2 of the Intercreditor prohibits Defendants from contesting valuation in their capacity as junior secured creditors in connection with the Plan (or any other plan) supported by HPS.

97.    Defendants inarguably contested valuation in their objections to confirmation of the Plan, characterizing the Debtors' valuation as "grossly understated" and a "low-ball" estimation.  (D.I. 661 at 7, 61).

## V.    THE INTERCREDITOR AGREEMENT EXPLICITLY LIMITS DEFENDANTS' RIGHTS

98.    The Intercreditor Agreement plainly applies to, and limits the rights of, Defendants in this action.

99.    Defendants clearly have been arguing in their capacity as junior secured creditors throughout these cases, as members of the self-characterized "ad hoc group of holders of Second Lien Notes."

100.    Furthermore, even if Defendants had raised arguments in their capacity as unsecured creditors – and they have not – the Intercreditor still limits their rights in such capacity.  Section 5.4 of the Intercreditor provides:

> Subordinated Lien Debt Representatives and the Subordinated Lien Secured Parties may exercise rights and remedies as an unsecured creditor against the Company or any Subsidiary that has guaranteed the Subordinated Lien Claims in accordance with the terms of the applicable Subordinated Lien Debt Documents and applicable law *except to the extent the exercise of such rights and remedies conflicts with the provisions set forth in Sections 2.2, 2.3, 3.1(a), 3.1(c), 4.2, 4.3, 5.2, 6.1 through 6.11, 7.3, 8.5 and 8.21*.

(Ex. A, Intercreditor Agreement § 5.4 (emphasis added)).

101.    The enumerated sections set out in Section 5.4 are each clearly and explicitly carved out of the rights that Defendants might claim as unsecured creditors.    Thus, Defendants cannot claim rights as unsecured creditors in order to circumvent Sections 2.2, 6.1, 6.2, and 6.7, each one of which bars their filing of the motion to lift the stay, the Adversary Complaint, the Standing Motion, and their objections to the Plan.

## COUNT I
### (Breach of Contract – Intercreditor Section 6.2)

102.    Plaintiffs repeat and re-allege all preceding paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

103.     The Intercreditor is a valid contract governed by New York law.   It was properly formed and entered into by LBI, the Collateral Trustee, and the Second Lien Trustee for good and valuable consideration.

104.     The Intercreditor is binding on the parties to the Agreement, as well as the First and Second Lien Investors, who are third-party beneficiaries under Section 8.16 of the Agreement.

105.     By its terms and pursuant to Section 510(a) of the Bankruptcy Code, the Intercreditor is enforceable in the Debtors' Chapter 11 cases, and HPS and the First Lien Collateral Trustee are entitled to seek enforcement of the provisions contained therein.

106.     Plaintiffs have fully performed their obligations under the Intercreditor.

107.     Defendants have breached Section 6.2 of the Intercreditor by filing their motion to lift the automatic stay, the Adversary Complaint, the Standing Motion, and the Proposed Adversary Complaint.   All of those filings sought relief in respect of assets of LBI that constitute First Priority Lien Collateral, without the prior written consent of HPS and the First Priority Lien Collateral Trustee.

108.     As a direct and proximate cause of Defendants' breaches of their contractual obligations, HPS has suffered, and will continue to suffer, significant damages.

109.     Defendants are liable to HPS and the First Lien Collateral Trustee for breaches of their contractual obligations.

110.     Plaintiffs are entitled to an order of specific performance compelling Defendants to comply with Section 6.2 of the Intercreditor.   Section 8.12 explicitly permits the First Priority Lien Collateral Trustee to "demand specific performance of" the Intercreditor.   Moreover, under Section 8.12, Defendants irrevocably waived any available

defense based on the adequacy of a remedy at law, as well as any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First Lien Collateral Trustee or by HPS as a third-party beneficiary.

111.    Plaintiffs are also entitled to specific performance of the Intercreditor regardless of the specific grant of that remedy in Section 8.12.  While HPS and the First Lien Collateral Trustee are ready, willing, and able to perform their obligations under the Intercreditor, Defendants have refused to perform their obligations under that contract and have made clear that they intend to continue breaching that contract in the future.  No adequate remedy at law exists for Defendants' breaches because the value of those obligations to Plaintiffs, and the value of the assets and liens protected by those obligations, are unique and difficult, if not impossible, to measure.

112.    This Court should issue a declaratory judgment that (1) the Intercreditor is a valid and enforceable agreement; (2) that Plaintiffs HPS and the First Lien Collateral Trustee are entitled to seek enforcement of its terms; and (3) that Defendants have breached Section 6.2 of that contract.  HPS's and the First Lien Collateral Trustee's interests are directly adverse to Defendants' interests because Defendants have breached, and have announced their intent to continue breaching, a contract that binds HPS and the First Lien Collateral Trustee. A declaratory judgment, if issued, would result in a conclusive judgment between the parties clarifying their legal relationship under the Intercreditor, which is a pure question of law. And a declaratory judgment would offer significant utility to all the parties in this action by resolving critical issues raised in LBI's chapter 11 proceeding.

113.    Section 8.21 of the Intercreditor provides that

> In the event that any Subordinated Lien Secured Party acts in any
> fashion that is prohibited by or otherwise inconsistent with any

> provision of this Agreement, such Subordinated Lien Secured
> Party shall be individually liable for and shall pay any reasonable
> attorneys' fees, costs and expenses incurred by any of the First
> Priority Lien Holders that arise out of or relate to such
> Subordinated Lien Secured Party's action, including all amounts
> incurred responding to that action in any court pursuing any
> affirmative claims against such Subordinated Lien Secured Party
> as a result of that action.

(Ex. A, Intercreditor Agreement § 8.21).

114.    Defendants are Subordinated Lien Secured Parties, as defined in Section 1.1 of

the Intercreditor.    Therefore, because Defendants have breached Section 6.2 of the

Intercreditor, Defendants are liable for the reasonable attorneys' fees, costs, and expenses

incurred by HPS in responding to that breach.

115.    The First Lien Collateral Trustee is also entitled to its fees and expenses

pursuant to the Intercreditor Agreement. That Agreement defines "First Priority Lien

Holders" as "[p]ersons holding First Priority Claims, including the First Priority Lien Debt

Representatives and the First Priority Lien Secured Parties."    "First Priority Lien Secured

Parties," in turn, are defined as "the holders of First Priority Lien Obligations, any First

Priority Lien Debt Representatives and the First Priority Lien Collateral Trustee."    Thus,

because the First Lien Collateral Trustee is a First Priority Lien Secured Party, it is a "First

Priority Lien Holder" entitled to fees and expenses under Section 8.21.    Defendants are

therefore liable as well for the reasonable attorneys' fees, costs, and expenses incurred by the

First Lien Collateral Trustee in responding to Defendants' breach of Section 6.2 of the

Intercreditor.

## COUNT II
### (Breach of Contract – Intercreditor Section 6.7)

116.    Plaintiffs repeat and re-allege all preceding paragraphs of this Complaint,

which are incorporated by reference as if set forth fully herein.

117.    The Intercreditor is binding on the parties to the Agreement, as well as the First and Second Lien Investors, who are third-party beneficiaries under Section 8.16 of the Agreement.

118.    By its terms and pursuant to Section 510(a) of the Bankruptcy Code, the Intercreditor is enforceable in the Debtors' Chapter 11 cases, and HPS and the First Lien Collateral Trustee are entitled to seek enforcement of the provisions contained therein.

119.    Plaintiffs have fully performed their obligations under the Intercreditor.

120.    Defendants have breached Section 6.7 of the Intercreditor by challenging HPS's claim for a post-petition make-whole amount in their stay relief motion, the Adversary Complaint, the Standing Motion, the Proposed Adversary Complaint, and objections to the Plan.

121.    As a direct and proximate cause of Defendants' breaches of their contractual obligations, HPS has suffered, and will continue to suffer, significant damages.

122.    Defendants are liable to HPS and the First Lien Collateral Trustee for breaches of their contractual obligations.

123.    Plaintiffs are entitled to an order of specific performance compelling Defendants to comply with Section 6.7 of the Intercreditor.  Section 8.12 explicitly permits the First Priority Lien Collateral Trustee to "demand specific performance of" the Intercreditor.  Moreover, under Section 8.12, Defendants irrevocably waived any available defense based on the adequacy of a remedy at law, as well as any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First Lien Collateral Trustee or by HPS as a third-party beneficiary.

01:24291468.1

124.    Plaintiffs are also entitled to specific performance of the Intercreditor regardless of the specific grant of that remedy in Section 8.12.  While HPS and the First Lien Collateral Trustee are ready, willing, and able to perform their obligations under the Intercreditor, Defendants have refused to perform their obligations under that contract and have made clear that they intend to continue breaching that contract in the future.  No adequate remedy at law exists for Defendants' breaches because the value of those obligations to Plaintiffs, and the value of the assets and liens protected by those obligations, are unique and difficult, if not impossible, to measure.

125.    This Court should issue a declaratory judgment that (1) the Intercreditor is a valid and enforceable agreement; (2) that Plaintiffs HPS and the First Lien Collateral Trustee are entitled to seek enforcement of its terms; and (3) that Defendants have breached Section 6.7 of that contract.  HPS's and the First Lien Collateral Trustee's interests are directly adverse to Defendants' interests because Defendants have breached, and have announced their intent to continue breaching, a contract that binds HPS and the First Lien Collateral Trustee.  A declaratory judgment, if issued, would result in a conclusive judgment between the parties clarifying their legal relationship under the Intercreditor, which is a pure question of law.  And a declaratory judgment would offer significant utility to all the parties in this action by resolving critical issues raised in LBI's Chapter 11 proceeding.

126.    Section 8.21 of the Intercreditor provides that

> In the event that any Subordinated Lien Secured Party acts in any fashion that is prohibited by or otherwise inconsistent with any provision of this Agreement, such Subordinated Lien Secured Party shall be individually liable for and shall pay any reasonable attorneys' fees, costs and expenses incurred by any of the First Priority Lien Holders that arise out of or relate to such Subordinated Lien Secured Party's action, including all amounts incurred responding to that action in any court pursuing any

> affirmative claims against such Subordinated Lien Secured Party as a result of that action.

(Ex. A, Intercreditor Agreement § 8.21).

127.    Defendants are Subordinated Lien Secured Parties, as defined in Section 1.1 of the Intercreditor.    Therefore, because Defendants have breached Section 6.7 of the Intercreditor, Defendants are liable for the reasonable attorneys' fees, costs, and expenses incurred by HPS in responding to that breach.

128.    The First Lien Collateral Trustee is also entitled to its fees and expenses pursuant to the Intercreditor Agreement. That Agreement defines "First Priority Lien Holders" as "[p]ersons holding First Priority Claims, including the First Priority Lien Debt Representatives and the First Priority Lien Secured Parties."   "First Priority Lien Secured Parties," in turn, are defined as "the holders of First Priority Lien Obligations, any First Priority Lien Debt Representatives and the First Priority Lien Collateral Trustee."   Thus, because the First Lien Collateral Trustee is a First Priority Lien Secured Party, it is a "First Priority Lien Holder" entitled to fees and expenses under   Section 8.21.    Defendants are therefore liable as well for the reasonable attorneys' fees, costs, and expenses incurred by the First Lien Collateral Trustee in responding to Defendants' breach of Section 6.7 of the Intercreditor.

## COUNT III
### (Breach of Contract – Intercreditor Section 2.2)

129.    Plaintiffs repeat and re-allege all preceding paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

130.    The Intercreditor is a valid contract governed by New York law.   It was properly formed and entered into by LBI, the Collateral Trustee, and the Second Lien Trustee

01:24291468.1

for good and valuable consideration.

131.    The Intercreditor is binding on the parties to the Agreement, as well as the First and Second Lien Investors, who are third-party beneficiaries under Section 8.16 of the Agreement.

132.    By its terms and pursuant to Section 510(a) of the Bankruptcy Code, the Intercreditor is enforceable in the Debtors' Chapter 11 cases, and HPS and the First Lien Collateral Trustee are entitled to seek enforcement of the provisions contained therein.

133.    Plaintiffs have fully performed their obligations under the Intercreditor.

134.    Defendants breached Section 2.2 of the Intercreditor when they challenged the validity, perfection, priority, extent, or enforceability of the First Lien Noteholders' first-priority lien by seeking equitable subordination of HPS's First Lien Notes in the Adversary Complaint and the Proposed Adversary Complaint and by objecting to the Plan.

135.    As a direct and proximate cause of Defendants' breaches of their contractual obligations, HPS has suffered, and will continue to suffer, significant damages.

136.    Defendants are liable to HPS and the First Lien Collateral Trustee for breaches of their contractual obligations.

137.    Plaintiffs are entitled to an order of specific performance compelling Defendants to comply with Section 2.2 of the Intercreditor.  Section 8.12 explicitly permits the First Priority Lien Collateral Trustee to "demand specific performance of" the Intercreditor.  Moreover, under Section 8.12, Defendants irrevocably waived any available defense based on the adequacy of a remedy at law, as well as any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First Lien Collateral Trustee or by HPS as a third-party beneficiary.

138.    Plaintiffs are also entitled to specific performance of the Intercreditor regardless of the specific grant of that remedy in Section 8.12.  While HPS and the First Lien Collateral Trustee are ready, willing, and able to perform their obligations under the Intercreditor, Defendants have refused to perform their obligations under that contract and have made clear that they intend to continue breaching that contract in the future.  No adequate remedy at law exists for Defendants' breaches because the value of those obligations to Plaintiffs, and the value of the assets and liens protected by those obligations, are unique and difficult, if not impossible, to measure.

139.    This Court should issue a declaratory judgment that (1) the Intercreditor is a valid and enforceable agreement; (2) that Plaintiffs HPS and the First Lien Collateral Trustee are entitled to seek enforcement of its terms; and (3) that Defendants have breached Section 2.2 of that contract.  HPS's and the First Lien Collateral Trustee's interests are directly adverse to Defendants' interests because Defendants have breached, and have announced their intent to continue breaching, a contract that binds HPS and the First Lien Collateral Trustee. A declaratory judgment, if issued, would result in a conclusive judgment between the parties clarifying their legal relationship under the Intercreditor, which is a pure question of law. And a declaratory judgment would offer significant utility to all the parties in this action by resolving critical issues raised in LBI's Chapter 11 proceeding.

140.    Section 8.21 of the Intercreditor provides that

> In the event that any Subordinated Lien Secured Party acts in any fashion that is prohibited by or otherwise inconsistent with any provision of this Agreement, such Subordinated Lien Secured Party shall be individually liable for and shall pay any reasonable attorneys' fees, costs and expenses incurred by any of the First Priority Lien Holders that arise out of or relate to such Subordinated Lien Secured Party's action, including all amounts incurred responding to that action in any court pursuing any

affirmative claims against such Subordinated Lien Secured Party
as a result of that action.

(Ex. A, Intercreditor Agreement § 8.21).

141.    Defendants are Subordinated Lien Secured Parties, as defined in Section 1.1 of the Intercreditor.    Therefore, because Defendants have breached Section 2.2 of the Intercreditor, Defendants are liable for the reasonable attorneys' fees, costs, and expenses incurred by HPS in responding to that breach.

142.    The First Lien Collateral Trustee is also entitled to its fees and expenses pursuant to the Intercreditor Agreement.    That Agreement defines "First Priority Lien Holder" as "[p]ersons holding First Priority Claims, including the First Priority Lien Debt Representatives and the First Priority Lien Secured Parties."    "First Priority Lien Secured Parties," in turn, are defined as "the holders of First Priority Lien Obligations, any First Priority Lien Debt Representatives and the First Priority Lien Collateral Trustee."    Thus, because the First Lien Collateral Trustee is a First Priority Lien Secured Party, it is a "First Priority Lien Holder" entitled to fees and expenses under Section 8.21.    Defendants are therefore  liable as well for the reasonable attorneys' fees, costs, and expenses incurred by the First Lien Collateral Trustee in responding to Defendants' breach of Section 2.2 of the Intercreditor.

## COUNT IV
### (Breach of Contract – Intercreditor Section 6.1)

143.    Plaintiffs repeat and re-allege all preceding paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

144.    The Intercreditor is a valid contract governed by New York law.    It was properly formed and entered into by LBI, the Collateral Trustee, and the Second Lien Trustee

for good and valuable consideration.

145.   The Intercreditor is binding on the parties to the Agreement, as well as the First and Second Lien Investors, who are third-party beneficiaries under Section 8.16 of the Agreement.

146.   By its terms and pursuant to Section 510(a) of the Bankruptcy Code, the Intercreditor is enforceable in the Debtors' Chapter 11 cases, and HPS and the First Lien Collateral Trustee are entitled to seek enforcement of the provisions contained therein.

147.   Plaintiffs have fully performed their obligations under the Intercreditor.

148.   Defendants breached Section 6.1 of the Intercreditor by attempting to hinder or delay approval of the Debtors' DIP Financing, specifically, urging the Court to delay final approval of certain fees and expenses related to the DIP Financing until the second-day hearing, rather than approving them upon the entry of the interim DIP order.

149.   As a direct and proximate cause of Defendants' breaches of their contractual obligations, HPS has suffered, and will continue to suffer, significant damages.

150.   Defendants are liable to HPS and the First Lien Collateral Trustee for breaches of their contractual obligations.

151.   Plaintiffs are entitled to an order of specific performance compelling Defendants to comply with Section 6.1 of the Intercreditor.  Section 8.12 explicitly permits the First Priority Lien Collateral Trustee to "demand specific performance of" the Intercreditor.  Moreover, under Section 8.12, Defendants irrevocably waived any available defense based on the adequacy of a remedy at law, as well as any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First Lien Collateral Trustee or by HPS as a third-party beneficiary.

152.    Plaintiffs are also entitled to specific performance of the Intercreditor regardless of the specific grant of that remedy in Section 8.12.  While HPS and the First Lien Collateral Trustee are ready, willing, and able to perform their obligations under the Intercreditor, Defendants have refused to perform their obligations under that contract and have made clear that they intend to continue breaching that contract in the future.  No adequate remedy at law exists for Defendants' breaches because the value of those obligations to Plaintiffs, and the value of the assets and liens protected by those obligations, are unique and difficult, if not impossible, to measure.

153.    This Court should issue a declaratory judgment that (1) the Intercreditor is a valid and enforceable agreement; (2) that Plaintiffs HPS and the First Lien Collateral Trustee are entitled to seek enforcement of its terms; and (3) that Defendants have breached Section 6.2 of that contract.  HPS's and the First Lien Collateral Trustee's interests are directly adverse to Defendants' interests because Defendants have breached, and have announced their intent to continue breaching, a contract that binds HPS and the First Lien Collateral Trustee. A declaratory judgment, if issued, would result in a conclusive judgment between the parties clarifying their legal relationship under the Intercreditor, which is a pure question of law. And a declaratory judgment would offer significant utility to all the parties in this action by resolving critical issues raised in LBI's Chapter 11 proceeding.

154.    Section 8.21 of the Intercreditor provides that

> In the event that any Subordinated Lien Secured Party acts in any fashion that is prohibited by or otherwise inconsistent with any provision of this Agreement, such Subordinated Lien Secured Party shall be individually liable for and shall pay any reasonable attorneys' fees, costs and expenses incurred by any of the First Priority Lien Holders that arise out of or relate to such Subordinated Lien Secured Party's action, including all amounts incurred responding to that action in any court pursuing any

affirmative claims against such Subordinated Lien Secured Party
as a result of that action.

(Ex. A, Intercreditor Agreement § 8.21).

155.    Defendants are Subordinated Lien Secured Parties, as defined in Section 1.1 of the Intercreditor.    Therefore, because Defendants have breached Section 6.1 of the Intercreditor, Defendants are liable for the reasonable attorneys' fees, costs, and expenses incurred by HPS in responding to that breach.

156.    The First Lien Collateral Trustee is also entitled to its fees and expenses pursuant to the Intercreditor Agreement.    That Agreement defines "First Priority Lien Holder" as "[p]ersons holding First Priority Claims, including the First Priority Lien Debt Representatives and the First Priority Lien Secured Parties."    "First Priority Lien Secured Parties," in turn, are defined as "the holders of First Priority Lien Obligations, any First Priority Lien Debt Representatives and the First Priority Lien Collateral Trustee."    Thus, because the First Lien Collateral Trustee is a First Priority Lien Secured Party, it is a "First Priority Lien Holder" entitled to fees and expenses under § 8.21.    Defendants are therefore liable as well for the reasonable attorneys' fees, costs, and expenses incurred by the First Lien Collateral Trustee in responding to Defendants' breach of Section 6.1 of the Intercreditor.

**COUNT V**
**(Breach of Contract – Intercreditor Section 3.2)**

157.    Plaintiffs repeat and re-allege all preceding paragraphs of this Complaint, which are incorporated by reference as if set forth fully herein.

158.    The Intercreditor is a valid contract governed by New York law.    It was properly formed and entered into by LBI, the Collateral Trustee, and the Second Lien Trustee for good and valuable consideration.

01:24291468.1

159.     The Intercreditor is binding on the parties to the Agreement, as well as the First and Second Lien Investors, who are third-party beneficiaries under Section 8.16 of the Agreement.

160.     By its terms and pursuant to Section 510(a) of the Bankruptcy Code, the Intercreditor is enforceable in the Debtors' Chapter 11 cases, and HPS and the First Lien Collateral Trustee are entitled to seek enforcement of the provisions contained therein.

161.     Plaintiffs have fully performed their obligations under the Intercreditor.

162.     Defendants breached Section 3.2 of the Intercreditor by contesting the valuation proposed by LBI in connection with the confirmation of the Plan.

163.     As a direct and proximate cause of Defendants' breaches of their contractual obligations, HPS has suffered, and will continue to suffer, significant damages.

164.     Defendants are liable to HPS and the First Lien Collateral Trustee for breaches of their contractual obligations.

165.     Plaintiffs are entitled to an order of specific performance compelling Defendants to comply with Section 3.2 of the Intercreditor.  Section 8.12 explicitly permits the First Priority Lien Collateral Trustee to "demand specific performance of" the Intercreditor.  Moreover, under Section 8.12, Defendants irrevocably waived any available defense based on the adequacy of a remedy at law, as well as any other defense that might be asserted to bar the remedy of specific performance in any action that may be brought by the First Lien Collateral Trustee or by HPS as a third-party beneficiary.

166.     Plaintiffs are also entitled to specific performance of the Intercreditor regardless of the specific grant of that remedy in Section 8.12.  While HPS and the First Lien Collateral Trustee are ready, willing, and able to perform their obligations under the

Intercreditor, Defendants have refused to perform their obligations under that contract and have made clear that they intend to continue breaching that contract in the future.   No adequate remedy at law exists for Defendants' breaches because the value of those obligations to Plaintiffs, and the value of the assets and liens protected by those obligations, are unique and difficult, if not impossible, to measure.

167.    This Court should issue a declaratory judgment that (1) the Intercreditor is a valid and enforceable agreement; (2) that Plaintiffs HPS and the First Lien Collateral Trustee are entitled to seek enforcement of its terms; and (3) that Defendants have breached Section 3.2 of that contract.   HPS's and the First Lien Collateral Trustee's interests are directly adverse to Defendants' interests because Defendants have breached, and have announced their intent to continue breaching, a contract that binds HPS and the First Lien Collateral Trustee. A declaratory judgment, if issued, would result in a conclusive judgment between the parties clarifying their legal relationship under the Intercreditor, which is a pure question of law. And a declaratory judgment would offer significant utility to all the parties in this action by resolving critical issues raised in LBI's Chapter 11 proceeding.

168.    Section 8.21 of the Intercreditor provides that

> In the event that any Subordinated Lien Secured Party acts in any fashion that is prohibited by or otherwise inconsistent with any provision of this Agreement, such Subordinated Lien Secured Party shall be individually liable for and shall pay any reasonable attorneys' fees, costs and expenses incurred by any of the First Priority Lien Holders that arise out of or relate to such Subordinated Lien Secured Party's action, including all amounts incurred responding to that action in any court pursuing any affirmative claims against such Subordinated Lien Secured Party as a result of that action.

(Ex. A, Intercreditor Agreement § 8.21).

169.    Defendants are Subordinated Lien Secured Parties, as defined in Section 1.1 of the Intercreditor.  Therefore, because Defendants have breached Section 3.2 of the Intercreditor, Defendants are liable for the reasonable attorneys' fees, costs, and expenses incurred by HPS in responding to that breach.

170.    The First Lien Collateral Trustee is also entitled to its fees and expenses pursuant to the Intercreditor Agreement.  That Agreement defines "First Priority Lien Holder" as "[p]ersons holding First Priority Claims, including the First Priority Lien Debt Representatives and the First Priority Lien Secured Parties."  "First Priority Lien Secured Parties," in turn, are defined as "the holders of First Priority Lien Obligations, any First Priority Lien Debt Representatives and the First Priority Lien Collateral Trustee."  Thus, because the First Lien Collateral Trustee is a First Priority Lien Secured Party, it is a "First Priority Lien Holder" entitled to fees and expenses under § 8.21.  Defendants are therefore liable as well for the reasonable attorneys' fees, costs, and expenses incurred by the First Lien Collateral Trustee in responding to Defendants' breach of Section 3.2 of the Intercreditor.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment for Plaintiffs and against Defendants as follows:

a.    Declaring that the Intercreditor is a valid and enforceable agreement binding on Defendants, and enforceable by HPS and the First Lien Collateral Trustee;

b.    Declaring that Defendants breached Section 2.2 of the Intercreditor by filing their Adversary Complaint, Proposed Adversary Complaint, and objections to the Plan, and enjoining Defendants from further challenging the validity, perfection, priority, extent, or enforceability of the First Lien Noteholders' first-priority lien;

01:24291468.1

c.     Declaring that Defendants breached Section 3.2 of the Intercreditor by contesting the valuation proposed by LBI in connection with the confirmation of the Plan, and enjoining Defendants from continuing to contest that valuation;

d.     Declaring that Defendants breached Section 6.1 of the Intercreditor by attempting to hinder or delay approval of the Debtors' DIP Financing;

e.     Declaring that Defendants breached Section 6.2 of the Intercreditor by seeking relief from the automatic stay and filing the Adversary Complaint, the Standing Motion, and the Proposed Adversary Complaint, and enjoining Defendants from continuing to pursue such relief;

f.     Declaring that Defendants breached Section 6.7 of the Intercreditor by seeking relief from the automatic stay and filing the Adversary Complaint, the Standing Motion, and the Proposed Adversary Complaint, and enjoining Defendants from continuing to pursue such relief;

g.     Issuing an order of specific performance compelling Defendants to comply with the Intercreditor, including, but not limited to, Sections 2.2, 3.2, 6.1, 6.2, and 6.7 of that Agreement;

h.     Awarding HPS and the First Lien Collateral Trustee reasonable attorneys' fees, costs, and expenses incurred as a result of Defendants' breach, including without limitation those fees, costs, and expenses incurred in connection with this adversary proceeding;

i.     Awarding HPS damages in an amount to be determined at trial; and

j.     Awarding such other and further relief as may be just and proper.

01:24291468.1

Dated:  March 18, 2019
        Wilmington, Delaware

/s/ Pauline K. Morgan
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Pauline K. Morgan (Bar No. 3650)
M. Blake Cleary (Bar No. 3614)
Ian J. Bambrick (Bar No. 5455)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

MOLOLAMKEN LLP
Steven F. Molo (admitted *pro hac vice*)
Justin M. Ellis (admitted *pro hac vice*)
430 Park Avenue
New York, NY 10022
Telephone:  (212) 607-8160
Facsimile:  (212) 607-8161
smolo@mololamken.com

*Counsel for Plaintiffs Ankura Trust Company,*
*LLC, in its capacity as First Lien Collateral*
*Trustee, & HPS Investment Partners, LLC*

01:24291468.1